All right, we'll let y'all get set and then we'll hear first from counsel in case number 17-20158, United States v. Evans. Otherwise, we'll hear from counsel for Richard Evans. Good morning, and may it please the Court, I'm Carl Hennis, and I represent the appellant, Dr. Richard Evans. This morning, I'm going to focus on the first issue raised in our brief, the Confrontation Clause, which affects all counts of conviction. We're here today because Dr. Evans was denied the opportunity to impeach a key inside witness about her motive to curry favor in her testimony. That witness was Dr. Evans' longtime medical assistant, Brenda Clayton. Is the target letter in the record? Yes, Your Honor, it is. Do you know where? I do not, but we cited the record page in our brief. Was it signed by the same assistant U.S. attorney that was the one that elicited the testimony from? The target letter was signed on behalf of the grand jury by the same prosecutor that elicited. We've never said you're in trouble? Yes, Judge Higgins, and it was. And last question, just factually, how long before trial, before the testimony, was the target letter sent with the grand jury subpoena? I believe the target letter was sent in September, and trial was in June or July of the next year, but I would have to confirm. Approximately, okay. Yeah. Thanks. As we were just discussing, before calling Clayton in its case in chief, the government sent Clayton a target letter threatening her with prosecution. This gave Clayton a powerful motive to curry favor in her testimony. At trial, Dr. Evans tried to cross-examine Clayton about the target letter. But the government objected, and the district court prohibited the cross-examination. As we just forecasted, the government did not just block Dr. Evans' attempt to impeach Clayton's testimony. The government compounded the error by bolstering Clayton's testimony. The government repeatedly told her on the stand and in front of the jury that it did not think she had done anything wrong, despite having sent her a target letter. This violation of the Confrontation Clause requires reversal on all 19 counts of conviction. Do you think the fact there's so little circuit law about the admissibility of target letters, subject letters, witness letters, is because it's so obviously impeachment? Or is it because these are very strange creatures early in an investigative stage that would be very confusing for a jury to understand, and therefore courts routinely say this is too confusing under 403? I think it's definitely the first judgment. It is black-letter law that a criminal... Why is there so little law? That's a good question. But, I mean, in our view, there might be so little law because this is a black-letter law violation of the Confrontation Clause. The Confrontation Clause gives a criminal defendant the right to cross-examine a witness about that witness's motive for favoring the prosecution. And that's a straightforward application of the Supreme Court's decision in Delaware v. Van Arsdale and several... So the cross-examiner says, I'm showing you this document, have you ever seen it? Yeah, that came when I was asked to go to the grand jury. Could you explain what putative defendant means? The jury would... The witness is going to have to say, well, I guess there's a body called the grand jury. This reflects what maybe they think, the links they think there exist, and therefore I'm a putative defendant. It's a very odd document for a witness to try to disavow. You see, the point that I'm worried about is I would think it would be highly confusing to allow heavy cross-examination into a target letter. I don't think it would be that confusing. By sending the target letter, the United States Attorney's Office had substantial evidence linking Ms. Clayton to the commission of a crime, and that's just simply evidence that the jury needed to hear as the sole judge of Clayton's credibility in order to evaluate her credibility. Isn't the evidence not so much what does this letter mean as a legal matter that we learn in law school, but rather the impact it had on Clayton and her willingness to testify against her boss? Isn't that really what you're cross-examining about? I mean, if she doesn't understand the word putative defendant, then it had no impact on her. If she misunderstood it and thought it meant she was a defendant unless she testified, it had an impact on her rightly or wrongly, and that's the kinds of questions you would be asking, right? Absolutely, and to be clear, the target letter itself did not say she was a putative defendant. That's from the U.S. Attorney's Manual, which governs how they send out these target letters. The letter itself said that she was a target of a federal criminal investigation for suspected violations of federal criminal law, including the distribution of controlled substances, and that seems to be something that is well within Clayton's ability to testify to. Mann was your witness, correct, Ms. Mann? Yes. She ran into the same problem, but from the defense side. That's right. She was under the threat of a target letter, and at trial, the government indicated that it was still considering prosecuting her, and she was concerned about it, and the district court also said that the defense could not get into her status as a target of the government's investigation. But isn't the problem with Mann that having called her, she pretty much duplicated what Clayton said, so even if we were to agree with you that there was error, isn't the problem with the harmless error analysis that really Clayton was cumulative because of Mann and others who testified to the same stuff? Two points on that, Judge Haynes. I think, first of all, Mann did not duplicate everything Clayton testified to. She might have duplicated certain parts of it, but Clayton was on the stand for over a day, and Ms. Mann was on the stand for a much shorter period of time. And the second point is, is that because Ms. Mann was under a similar target letter, and was similarly being threatened with prosecution, even if she said everything the same as Clayton, she was still susceptible to the same- But y'all called her. So it's a little different circumstance than- the argument with Clayton is you're trying to make your case against us by putting on this witness and then shielding her from anything that would show she has a motivation to stretch her testimony in favor of the government. But with Mann, y'all put her on so that you don't have that argument. I think that maybe minimizes the difficult position that the defense was in, where the decision is between putting on a witness and perhaps on cross-examination the government's going to be able to go into things that corroborate what another witness says, and not being able to put on an inside witness at all. If that was the case, the government would have been the only party in this case that would have been able to put on an inside witness. What was the most incriminating thing that Clayton said that no other exhibit or witness corroborated? So I think there's three things that she really said that supported the government's theory of the case, Judge Higginson. First, she said that for follow-up patients, she would just fill in the prescription before Judge Evans got into the room. She said that for mail-in patients, Dr. Evans pre-signed prescriptions for her to fill in later, and that Dr. Evans did not change the prescriptions for the mail-in patients. And then she testified to the context of these various office rules and policies that the government relied on in its case. These are things such as the parking lot policy, the dress code. And she specifically said that they needed those rules and policies for pain patients because they came from out of state. So this was powerful circumstantial evidence from a key inside witness that very easily could have tipped the scales in favor of the government as the jury was determining whether the government had proved its case. But didn't others testify to that effect? I mean, she's not the only witness on that. That's the problem. I guess to add to Judge Higginson's question, what was the worst thing she said that only she said? Well, I think with regard to her filling out prescriptions before Judge Evans came into the room, she's the only witness that can testify to that. And given that we could not go into her credibility, the jury could not determine whether she was telling the truth with regard to that particular thing. So no one else testified that the prescriptions were filled out before the doctor saw them? That Brenda Clayton pre-filled the prescriptions. Well, not that she did, but that anybody did. In other words, that the doctor wasn't really overseeing the prescriptions. That's the import of that testimony, that he's just signing whatever's put in front of him. Correct. No one else testified to that? That's your position? I don't believe so. I think she was the primary one that testified. And this man may have got there a little bit, but Brenda Clayton was the primary one that said no, if the patient wanted to increase, if they wanted the same prescription, I filled it in, and Dr. Evans came in and signed it. And that was really important testimony. No one else testified to the necessity of these various rules and policies, and she came out and straight said it. She said these patients came from out of state. That's why we needed these policies. Okay, I wanted to ask you, because I know you said you wanted to focus on this, and I know why, because it gets you a whole new trial. But I wanted to focus in on some stuff that doesn't get you a whole new trial, but is still important. And that's this whole mail fraud thing. I'm having a little bit, I understand the argument that you didn't really defraud. I mean, if you're a drug dealer, and if Dr. Evans is a drug dealer, and he's selling drugs and he sells the drugs, he didn't really defraud anybody. Um, is that a challenge really to the indictment, or is that really more of a challenge to the evidence that supported the indictment? Judge Haynes, I think that it's both, and that's how we explain it in our brief, is that the indictment does not allege any misrepresentation, and certainly not a material misrepresentation. That is why Dr. Evans joined a motion to dismiss pre-trial on these exact grounds, that there was no misrepresentation and no deception. But then he didn't challenge the new indictment. That's right. The new indictment was superseding. The superseding indictment. I'm looking for the word, superseding indictment. That's right. But the superseding indictment was substantially similar, and certainly did not add any language of a misrepresentation or any deception on the part of Dr. Evans. And then as we explained in our brief, not only did the indictment not allege it, at trial the government just completely failed to present any evidence of a misrepresentation. And in fact, the government repeatedly said that these were customers. They got what they wanted. Dr. Evans got what they wanted. So how about the misrepresentation in essence, that I, your doctor, am giving you medicine that will help you and that is for your health and your well-being, rather than on feeding your drug habit? That's completely, the government never brought out any misrepresentation about that and never questioned any witness on whether they felt defrauded, whether they felt there was a material misrepresentation. But I think the most important thing is that just goes against their entire theory of the case. If a patient was there for a legitimate purpose and wanted pain medicine and was relying on the fact that Dr. Evans was a licensed doctor who was able to prescribe pain medication, then that patient was, it's hard to say how that particular prescription was outside the course of medical practice. But if that patient was only there to get drugs, they don't care whether Dr. Evans is a medical doctor or whether he's wearing a white coat, they just want their drugs. So there's... So you're saying either patient got what they wanted. Either patient got what they wanted and there was no material... How about the patient who does have pain, but he does not recognize or doesn't try to recognize their addiction and fuels an addiction for them, rather than simply helping them with their pain? I mean, the idea that he didn't do enough to resolve the pain issues outside of just fueling more and more pills. I guess there's still, there's no misrepresentation that Dr. Evans made... So that's the core of your argument. Absent there being a misrepresentation, we can point to the indictment's defective. That's your argument. It's an indictment deficiency or it's a sufficiency of the evidence argument? I think it's both. There's no misrepresentation in the indictment. And then at trial, the government completely failed to... But you were able to argue these are real patients with real pain. Correct. And the jury disbelieved that? The jury disbelieved that. Well, I don't know that the jury disbelieved that they were real patients with real pain, but considering the multitude of errors, the jury did. Your best authority for this specific attack on mail fraud, is that the Starr decision from the Second Circuit? I think it shows that where there's an arm's length transaction and no deception... Well, actually in Starr there was a deception, but where there's no misrepresentation that gets to the basis of the bargain... But are you therefore relying on Starr or not? Yes. Because that's a plurality and Judge Newman described that, well, it was really the post office that was being defrauded. That isn't your argument here. No, and I think that this case would be different if, you know, they allege Medicare fraud against the pharmacist, David DeVito, and that is a different issue that was never brought up with the government. I always thought Starr was sort of a Second Circuit only theory, you know, that the defendant had to contemplate harm to the victim, but that no other circuit had adopted that. Well, I think Starr does say that, but I think our case is even more distinguishable because at least in Starr, the government, the defense admitted that, excuse me, the court admitted that there was actually deception in Starr. May I finish? Sure. The court actually admitted that there was deception in Starr, even though it didn't affect the basis of the bargain, but here there simply wasn't any effect on the basis of the bargain and there was no deception. Thank you. All right. Thank you. You've reserved time for rebuttal. Actually, your colleague has reserved time for rebuttal, and we'll now hear from Ms. Wilson for the United States. May it please the Court. This appeal involves heightened standards of review following the jury's conviction of Dr. Evans' operation of a pill mill. Under no circumstances were Dr. Evans' confrontation rights violated. The district court properly exercised its wide discretion. The jury could tell that Clayton wasn't trying to curry favor with the government. She expressly disavowed... The problem with wide discretion is I want to question you about X, Y, Z, and I'm asking the same question over and over again all day long, and the judge finally says, all right, that's enough. Move on to A, B, C instead of X, Y, Z. Whereas here the judge said you can't ask about X, Y, Z at all. That's a little different from the wide discretion to kind of keep things moving in a court and avoid repetition and wasting everyone's time, right? I appreciate that, but the courts say that the district court has wide latitude in these situations, and what we had was a very fragile witness. But she still testified that she wasn't a police officer. She also disavowed seeing anything inappropriate that was going on, although the dental employee said it was overt about people washing in the restroom, loitering, and so much so that the office had to implement policies telling people don't arrive before 8.15, don't hang around, and things of that nature. Fragile witness, though, could easily be she's really nervous she'll be indicted unless she says the receipt was the right thing. If all this, I was reading the record, she was very nervous, but why isn't that consistent with someone who's been told they're a target and wants to get it just right for the government? Well, two points. First, you had asked, Your Honor, about the target letter. And that was on September 4, 2015. And you are correct that the lead trial AUSA drafted, excuse me, signed the letter. And the site there is page 9,461. And as you may know from my brief, we had some serious problems trying to get the record filed in terms of the exhibits because of a macro totally over my head. But anyway, that's the record, you know, the stamp that I have on there. Also, what's important to know is But what is clear in the record is the district judge, I couldn't really understand what the reason was. The district judge says, no, that's investigatory. And maybe then that's a 403-type problem. But then the government starts to bolster. I don't, with all due respect, I disagree. I think that Well, didn't the government says, I've never told you that we found anything you've done wrong. I do agree with that. But I don't think it's a traditional form of bolstering. I think if you read those Whatever it is, the same AUSA that wrote the letter saying you're a putative defendant, then asked the question, I've never told you you've done anything wrong. At that point, that letter becomes powerfully contradictory. Well, it does become contradictory if you just take those two things in an isolated situation. But the defense counsel is allowed to do that and then the district court wouldn't even let the defense proffer where they wanted to go. So gave no reasons, refused to have a proffer, and tells the jury to disregard the questions. That's a pretty strong I don't know what you mean by refused to allow them to proffer. The defendant at the first moment said, could I at least explain where we want to go? And the court said, no. You can't leave a record. And then the judge went back later and said, let's go back to your complaint. Right, and when he went back, I read, it didn't seem like he allowed, he gave any further reasons. He just said, that's investigative. But I think what's different here is the court saw that the witness was fragile and the AUSA wanted to declare her hostile. And the court said, no, you can't do that. She's not being cooperative and she pushes back with you, which contradicts or is certainly not indicative of somebody who's trying to curry favor with the government. All the more reason, this wouldn't have taken all afternoon. All the more reason to let the defendant have his right to cross-examine this witness. And if she's fragile and starts crying, well, we'll get some tissues and we'll move on. I don't understand this, we all have to be so worried about how fragile she is. She's a witness in the court and certainly you don't want anybody abusing her, but if she gets cross-examined and starts crying, we take a break, she can use some tissues and come back. I mean, I don't mean to be unfeeling, but that's how that works. Witnesses need to testify and witnesses testify about uncomfortable, unhappy, sad, difficult topics all the time. And you take a moment as a judge, you let them collect themselves and you move on. I mean, I have some experience with that concept. And that happened here. Okay, well, great. But that doesn't provide a basis to refuse the defense's right to cross-examine. I mean, that seems like a bizarre argument to me. I have a fragile witness, so let's not touch her. But even if, but even if this court determines there's error, Van Oursdale says, then we have to look to see whether it's harmless. Okay, let's get to that. And the law is very clear on that. The government agrees that Clayton was a key witness, but she wasn't an exclusive witness. By no means did the case rise and fall on Clayton. There was plenty of other evidence supporting the jury's convictions. Other witnesses... Two quick questions on that. One, did she testify to the presigning and nobody else testified to that? That's sort of one. And second of all, what was the extent of the cross? Was it clear through cross that she was complicit to? Complicit in? Complicit in the same fraud scheme. Were they able to extract that from their cross-examination? Oh, absolutely. Okay, so those two points. But first, no, she was not the only person to testify, aside from the expert witnesses. But Mann testified that they would be, that they would judge, I mean, not judge, excuse me, that Dr. Evans would sometimes presign these. And in fact, during the search, exhibit number 20, which is found on page 13662, the law enforcement found a stack of presigned prescriptions. I believe that there were 29 of them at the time. So, no, Clayton was not the only person. But also, you had some corroboration in terms of this whole pill mill operation through the, as I said before, the dental employees and others, and also... Yes, I don't know, we haven't really talked about this, but I find it disturbing that the notion that people are unkempt and not looking beautiful means they shouldn't be able to go see a doctor without somebody else in the office calling the police on them. I mean, that was a little bit disturbing to me, because I think homeless people, poor people, unkempt people should also be able to go see a doctor. Perhaps maybe need the doctor most. But there was more, and here's where there's more information. They had people walking around who seemed out of it. I think it was Smith or Epley, I can't remember which one, but one of the dental employees more than once saw somebody holding a prescription saying, I've got it. You also had these people coming in in droves from Louisiana. This was an unusual situation. And if the people needed a doctor, they could have stopped in Beaumont, Port Arthur, or even in Baytown. But instead, they drove into the heart of Houston. So there were a lot of suspicious things. I don't think this was necessarily somebody who thought people looked unkempt. There was a lot of testimony about that, a lot of discussion around that, that, wow, these people look shaggy, and they're dirty, and they're smelly. And I'm thinking, yes, and they deserve a doctor too. I mean, I don't know that you should have to smell a certain way to get medical care. I think standing alone, you're absolutely correct, but there was a lot more here, and the jury heard all of that. More importantly, we also had, and we can't lose sight of this, we have documentary evidence that came in. And the documentary evidence was such that we saw these prescriptions, we saw the money orders. The evidence was undisputed that whether after the first time somebody saw the doctor once or twice or immediately went on to this plan where essentially you sent in your money order and you got a prescription. So we have all of that type of evidence. What was the theory of the money order? I'm sorry? What was the theory of the money order? Was that sort of a substitute for what you would have paid if you had come in and had a personal visit? It was for an alleged office visit. And Dr. DeVito had even testified that when all this started, he had asked, and I think it was wrote a man about, it might have even been Dr. Evans, that, well, wait a second, are you going to interview these people? Like a phone interview to essentially make sure that they need this information. And he was assured that that would happen when in fact it did not. And so there was some contradictory evidence there. The jury also had the benefit of seeing a video where somebody had lupus and the doctor didn't even examine her or what have you. So the jury saw a lot of hardcore information as opposed to a he said, she said situation. And that's very important in a case like this as you hopefully can appreciate. The other thing is the case was very strong. The government's case was strong. And that's part of the Van Arsdale factor. The jury retired at 115 on July 25th. And the next day there was a verdict by 208. So that's very, very quick given all the accounts that they had to go through. Also, what's important too, as this court pointed out, is the other side called man. And she made a lot of these same points. In relation to the mail fraud counts, the government strongly maintains that this should be evaluated under a plain error situation. But before you get off harmlessness, you said you were going to get to the extent of the cross that did occur of Clayton. On Clayton? Well, the cross was fairly extensive in terms of they asked her about a lot of the practices and things of that nature. Of course, there was nothing about the target letter. But they had ample opportunity to cross her on a myriad of things. Am I answering your question? That they had a myriad of cross-examination points that they made? I would say so. There's nothing about participation in the fraud? Well, they had heard all this information about how the office ran. And they had the opportunity to ask follow-up questions. Part of her testimony, essentially, was that Mann saw the patients initially. Clayton did the follow-up visits. And Clayton is the one who handled the mail, for lack of a better word, meaning that the money orders came in, she would get the money order and get the prescription and present it or leave it or what have you for the doctor. And so they had all of that information available to them. They also had testimony from a couple of the patients, one of whom said that if she had taken all of the drugs that she got, she'd be dead or in a coma because some of these people were selling them and it was a very profitable venture for them. Because sometimes they'd get 360 pills. That's a lot of opioids. So they had the benefit of all that testimony. Does that answer your question? That's fine. So going back to the plain error, what happened was Dr. Evans filed a motion to join DeVito's dismissal under the original indictment. But his motion said that he agreed with the legal infirmities or something of that nature. It clearly didn't stand on its own. And the judge denied that motion. But instead of filing his own motion to dismiss on whatever ground he chose, he didn't do anything. Yeah, but he also denied the motion of the co-conspirator. So, I mean, there didn't seem to be much point there. If he had granted the motion of the co-conspirator and then he didn't file his own motion, then I would see what you're saying. But it's clear the judge thought the indictment was adequate. Right? Well, yes. And then there was the subsequent superseding indictment. So then that's the question. If we were to front him a little bit the fact that he challenged the indictment and was rejected, then does the failure to do that on the superseding indictment that didn't change anything relevant to this point, does that mean that we now evaluate as plain error rather than preserved error? Certainly, I would agree with that. Whenever something changes, as an advocate, you always have to protect your record. Another way they could have protected their record was objecting to the jury instructions, which they didn't do. And certainly in Rule 29, I think there was something about the Rule 29 in relation to a motion to dismiss, I know there was, rather, for the grand jury abuse. Because they subsequently filed a motion to dismiss for grand jury abuse after the superseding indictment. But that had nothing to do with the mail fraud counts. Let me ask you this. Is it error? I mean, even if we have to go through all four prongs of plain error or we just do the regular review, you still have to say, is it error? So, to me, the question is, should the indictment have had to name a misrepresentation? Well, there are three requirements for an indictment. Basically, you have to give notice to protect against double jeopardy, you have to give notice to defend yourself, and you have to track the elements of the indictment. And here, the indictment... I'm sorry, of the statute, thank you. Here, the indictment did basically track the requisite elements and it incorporated the paragraphs related to the conspiracy count. But what was the misrepresentation? Well, the misrepresentation, right, is that the doctor was acting... Well, we charged it as outside... The statute is outside the scope of being a professional and not for legitimate reasons. So the doctor is telling the client, I'm doing this for legitimate reasons when, in fact, he is not. Exactly. But the problem with this doctor... I mean, he was, in fact, a medical doctor and all of that, so he's not lying about that. The problem here is the allegation that these patients were coming to him as essentially a drug dealer. So if they thought he was a drug dealer and he's providing the drugs, then how is he misrepresenting? I mean, what evidence do we have coming at it another way? That somebody who came to him who got the 360 pills that she was selling thought that, oh, Dr. Evans is looking out for me, this is good for me, I need to take, you know, 10 opioids a day for my health. What evidence do we have that the patient was, in fact, misrepresented to in why they were getting all these pills? We have a few things. First of all, the doctor was pretending to run a legitimate operation in the sense that you went to see an LVN nurse, he had a massage therapist. Now, granted, we contend that none of these people were qualified, but he had the trappings of a legitimate medical office. He had an office in Tanglewood, which I realize you're not from Houston, but it was one of the best neighborhoods in Houston, right? So he's in this fancy area of town... Where they don't like smelly people. Where they at least stand out as not being part of the group. Right. But in any event, so you had these trappings or these suggestions of a legitimate medical office. They kept the files. Admittedly, they scheduled two files differently from the workers' comp people or what have you, but they were essentially operating as a medical office. So you had that. Then they take the people's money. So the money is supposed to be to render services, right? To render legitimate services. And instead of treating these people, this man was capable of working with addicted people and helping them with it. I know I'm going to pronounce this... Suboxone? But that didn't happen. Instead, he cemented their addiction. He also defrauded the pharmacists. Now, I know DeVito was in on it, but if you recall the testimony, and DeVito testifies this as well, that the other pharmacists ultimately think, what we're doing is not... He defrauded them by mail. Well, but it causes them to mail these prescriptions to Louisiana. And many of these prescriptions had a diagnosis on them. I just want to be clear, because I realize these are two separate things. An indictment has to allege sufficient facts to put on notice, and you're saying the misrepresentation is that he's running a legitimate pain relief when he's really running a drug deal. And then the evidence, sufficiency of the evidence, is what you just said. That the trappings were there, but in fact he wasn't doing what he was supposed to do, and the pharmacist was misled, and patients were also misled? Is that your position? Well, yeah, I mean, I think you can say that, because some of these patients, if not all of them, at least at one point, were in legitimate pain, right? They had to bring MRIs, they had to bring prior prescriptions. They got down this path because they started in pain. I mean, that's true if most opioid addiction begins in pain, and then works its way down the path. That's correct. And another thing, too, is there was also charged honest services fraud in the jury instructions, to which nobody objected. And so you have the agency type issues. I have a really quick question that we haven't covered at all, which is the money laundering. What amount of money would you have to show was spent out of this account to dig into the dirty money? Well, I think it's very important to analyze, or to look at these charts. And these charts start... If you look at approximately page 14,628 in the record till about 14,632, what you see in these charts is that there's this mushrooming of the Schedule 2 patients. And what Mr. McGee did is he went through these and he shows how the numbers increase greatly as the amount of Schedule 2 patients mushrooms, or, you know, essentially you have this exponential growth. And in the Amogee account, which is Exhibit 163A, that doesn't start until 2011. And by 2011, the Schedule 2 business was going full tilt. Some of the Schedule 2 business might have been legitimate. There was not proof that it was all drug dealing, if you will. I understand that. And, however, what we do have is substantial amounts of money. And during the key period, which is essentially January 11th, I'm sorry, January 2011 through September 2012, Dr. Evans made over $2.4 million. And the money laundering counts were substantially smaller than that. I think it was roughly $200,000. But if you extrapolate and follow the testimony with these charts, I think it's very enlightening. And you can see how he traces it. Does that answer it? Mr. Gerger, you have time for a vote. Thank you, Your Honor. Returning to Issue No. 1, the cross-examination of Clayton, Your Honor, let me tell you at page 2,120, Clayton and Clayton alone says that she filled out prescriptions before Evans saw patients. Ms. Mann did not testify to this. Nobody else testified to this. And that is because Clayton and Clayton alone saw the follow-up patients. Mann did not. So to harmlessness, right, harmless error, the government says it's not a close case. We give you examples at page 30 of our opening brief of appellate cases that are not close. The doctor who never sees the patient, who is working out of the back of his car, who just operates over the Internet, makes up fake patients. And you know from the evidence in this case that while the government says there was a lot of pills, every one of those pills is a legal pill. Schedule 2 was about half of his medical practice. And even the physician desk reference that every doctor has on his desk authorizes this pill in these quantities for chronic pain. And of course there's evidence on the other side. But he is a doctor. He does have an office. He has professionals providing real care. He should have had an office in a different part of town, I guess. Well, I don't know. But our point is simply this, that a drug dealer doesn't take the precautions that he took to insist on prior proof of injuries, MRIs. So you're saying it was a close case and therefore the harmless error analysis goes your way? Yes. What do you have to say? Because I didn't discuss with Mr. Hennis the issue of the money laundering. I understand y'all's argument is you didn't show that all of these Schedule 2 patients were in fact pill mill recipients. Some of them were legitimate. And given that, how we parse through this is a problem. So I'm looking for a number that they would have to exceed to definitely get into dirty money. What is that number in your view? All I can tell you, Your Honors, I don't have a number because it's the government's burden at trial to trace the funds that are in the account at the time that the check is written that is a money laundering account. And we think it's sufficient doubt that the evidence shows that that account contained investment money, treatment of workers' comp patients, treatment of cancer patients.  And addicts. Addicts who lied to him. No, but I mean he treated the suboxidone or whatever where people were addicted and he treated them. And then I do believe that he legitimately treated, even if we assume the government's correct that some people he was just furthering their addiction or whatever, there were some people that he actually treated appropriately. And so y'all's position, as I understand it, is we just can't tell which is which. And she says that these charts, which I need to delve into in more detail, show that they did parse it out. The government did parse it out sufficiently. And what's your answer to that? The charts make no effort to segregate out even how much Schedule II money was in that account at the time a check was written and how much other money, let's say good money, was in the account that a check was written. So even if we assume all Schedule II was dirty, they still haven't done it. That's correct, because they've never looked at tracing what went into that account before the check was written. And you would say that requires simply a vacator of the conviction altogether on those counts and not a new trial? We'll take either, but yes. Well, I mean, I think maybe I'm wrong. I thought the failure to present evidence when you have the burden as the government and it's double jeopardy, isn't it, to retry it? Yes. Okay, I mean, that seems sort of important. I also want to return to a question you asked, Judge Higginson, you know, about target letters and why is there so little case about target letters? I did want to say that I think in the Fifth Circuit the closest case would be Green v. Wainwright. 634 F. 2nd, 272. And I say that because, and my time is up, if I can finish that thought. Go ahead. There are cases such as Green where there is no charge pending against the witness. The witness is not charged. Clayton was not charged. But the possibility of being charged is what gives the motive to Curry favor. And a case I found since the brief went in is U.S. v. Anderson as well. 881 F. 2nd, 1128 from the D.C. Circuit. Again, a witness not under charges but who could be charged, and they talk about how Van Orn stands for it. And does the fact of the government exacerbating the problem with the, by saying we never said you did anything wrong, does that also factor into the harmlessness evaluation? Yes, but I think this would be reversible error without that bolstering, right? But that made it worse. All right, thank you very much. Appreciate the arguments from both sides and the cases under submission.